# Case No. 331.

## The AMIABLE NANCY.

[1 Paine, 111.][1]

Circuit Court, D. New York. Sept. Term, 1817.[2]

ADMIRALTY—JURISDICTION—MARINE TRESPASS OR TORT — PRIZE — DAMAGE BY PRIVATEERSMAN—MEASURE OF DAMAGES.

1. The district courts possessing all the powers of courts of admiralty, whether considered as instance or prize courts, have jurisdiction of all cases of marine trespass or tort.
[Cited in American Ins. Co. v. Johnson, Case No. 303; U. S. v. New Bedford Bridge. Id. 15.867; Waring v. Clarke, 5 How. (46 U. S.) 473; The Merchant, Case No. 9,434.]
[See note to U. S. v. Wiltberger, 5 Wheat. (18 U. S.) 106 et seq.]

2. If the master or crew of a privateer exceed their authority, and in the performance of legitimate acts commit an outrage, the owners are liable.
[Cited in New Jersey Steam Nav. Co. v. Merchants' Bank, 6 How. (47 U. S.) 435; The Mulhouse, Case No. 9,910.]

3. Where a neutral vessel was plundered of her papers by a privateer, in consequence of which she was seized by another belligerent, and proceeded against as prize, but made a compromise with her captors and paid a ransom and costs: Holden, that the owners of the privateer were not liable for those items, (there being no privity to the compromise,) nor for any other injurious consequences flowing from the compromise.
[Cited in The Mulhouse, Case No. 9,910.]

4. The rule of damages, in cases of marine trespass, is the full value of the property injured or destroyed. A claim for loss of voyage rejected.

5. Vindictive damages not allowable against the owners of a privateer, for trespasses committed by the crew. Whether the owners are liable at all for trespasses on the person? Quere.

[6. Cited in The Stephen Allen, Case No. 13,361, to the point that the jurisdiction of the court of the United States in admiralty is not limited by the rules of common law; Borden v. Hiern, Id. 1,655, to the point that an admiralty suit may embrace causes of action arising ex contractu and those arising ex delicto.]

[In admiralty. Libel by Peter Joseph Merault, owner of the schooner Amiable Nancy, and by the master, mate, supercargo, and one of the mariners, against the private armed brig the Scourge, for illegal detention and search. Decree for libelants.[3] Defendant appeals. Amount of the decree reduced. The libelants appealed to the supreme court, where the decree of the circuit court was modified by adding some items to the allowance. See The Amiable Nancy, 3 Wheat. (16 U. S.) 546.]

D. B. Ogden and C. D. Colden, for appellant.

T. A. Emmet, J. Wells, and J. O. Hoffman, for respondents.

Before LIVINGSTON, Circuit Justice, and VAN NESS, District Judge.

LIVINGSTON, Circuit Justice. This was a libel for damages in the district court for the southern district of New York, by the owner of the schooner the Amiable Nancy and her cargo, and by the master, mate, supercargo, and one of the mariners, against the appellants, as owners of the private armed brig the Scourge.
The facts were in brief as follows: The

---

[1][Reported by Elijah Paine, Jr., Esq.]
[2][Reversing an unreported decree of the district court.]
[3][Opinion not reported, and not now accessible.]

Amiable Nancy, a neutral vessel, on a voyage from Port-au-Prince to Bermuda, but steering, at the time of capture, for Antigua, was boarded in the year eighteen hundred and fourteen by a crew sent for the purpose of search and examination, by the commander of the Scourge. Having ascertained her neutral character, and the regularity of her papers, which employed about ten minutes, the crew of the Scourge, instead of returning to their own vessel, continued two hours on board of the Nancy; during which time they plundered the libellants of property valued by themselves at five hundred and seventy-nine dollars, and took away some articles belonging to the vessel, worth about twenty-five dollars. They also destroyed or carried away the schooner's papers, and beat and otherwise ill treated the supercargo and mariners. The schooner being abandoned by the boarding crew, pursued her course for Antigua, where she arrived the fourth day after her detention as aforesaid, and was there seized by his Britannic majesty's guard brig the Spider, in whose possession she remained about a fortnight. She was then libeled in the vice-admiralty of Antigua, and a condemnation expected, as is alleged, on the ground of her not being furnished with any papers. No counsel was employed, but a condemnation was suffered to pass by default, on a previous agreement between the captors and supercargo, entered into by the advice of the merchant who acted as consignee, that immediately after the condemnation, the schooner and cargo should be delivered to the supercargo, on his paying one thousand dollars to the captors, and all law and court charges. The supercargo was obliged to take away the balance in specie, he being allowed to put no cargo on board in consequence of the condemnation. This sum of one thousand dollars was accordingly paid to the captors, as also five hundred and forty-two dollars and twenty-one cents for court and law charges; to raise which, in specie, as no other money would be received, and also specie to take away with him, it became necessary to sell at a great discount the bills which had been given in payment of the schooner's cargo, which occasioned a further loss of five hundred and thirty-six dollars and forty-four cents. The whole sum disbursed for the items already mentioned, and for sundries supplied the schooner during her detention, amounted to two thousand one hundred and twenty-seven dollars and forty cents. The cargo, at the time of the plunder, consisted of 312½ barrels of corn, and one of arrow root, the invoice price of which at Port-au-Prince, exclusive of some charges, was sixteen hundred and twenty-one dollars and fifty-six cents. The corn was sold at Antigua, but before permission could be obtained for that purpose, the price of this article had fallen a dollar per bushel. Some of the corn was injured by the Spider's crew, who had mixed damaged with good corn, which caused a fermentation, that rendered it unfit for use; and it was in consequence thrown overboard, which produced a loss of twelve hundred dollars; at least the corn sold, which was 944½ bushels, netted two thousand six hundred and one dollars and nine cents. The maintenance of the master and supercargo while at Antigua, twenty-five tons stone ballast, the charge for protest, and allowing fifteen dollars per day for the expense of the schooner, while lying at Antigua, amounted to four hundred and fourteen dollars. The cargo might have been sold at Antigua (but for the interruption of the Spider,) for rum, and the probable amount of sales in that case would have been three thousand eight hundred and fifty dollars. This rum, it is stated might have been sold at St. Bartholomews, where it is said the schooner would have gone, had she not been captured by the Spider, and would have there produced probably more than four thousand dollars. It appears further, that the original plan of the voyage was to sell the cargo at Bermuda. The price of corn at which place is not mentioned, except it is stated to be very high. At Bermuda eight hundred muskets were to be taken in, which had already been contracted for at three dollars each, and for which the Haytien government was under agreement (which however is not produced,) to pay sixteen dollars a piece. From Antigua the schooner proceeded to St. Bartholomews, where she took in sundry articles, which sold, at an average, at the enormous profit of about three hundred per cent. at Port-au-Prince. Some of the parties concerned in the plunder of this schooner, have been tried by a naval court martial and punished for their misconduct.

On this evidence, the district court ordered the clerk to associate to himself two respectable merchants, and with them to estimate the damages sustained by the libellants by reason of the capture, and detention of the Amiable Nancy.

1. Those arising from the destruction of and taking and carrying away property from on board the said vessel.

2. All the expenses incurred at Antigua, including the loss on the corn and wages of the crew:

3. Interest on the amount of damages thus arising, from the time of the vessel's leaving Antigua.

4. A reasonable allowance for coming to the United States to prosecute this claim, collect testimony, &c.

5. The court further ordered, that the claim for damages, for personal injuries, and counsel fees, be allowed; but that the assessment of the same be made by the court on the filing and confirmation of the clerk's report.

In obedience to this order the clerk, and merchants as associated with him reported,

that they had assessed the damages as follows:

| | |
|---|---|
| Monies paid for redeeming vessel and cargo at Antigua after condemnation........ | $2,127 60 |
| Loss sustained on the sales of the cargo of corn at Antigua in consequence of the capture.................... | 1,200 00 |
| Detention, wages of the crew at Antigua in consequence of the Spider brig, occasioned by the loss of ship's papers.................... | 414 00 |
| Articles of plunder from the schooner.................... | 25 00 |
| Money and effects plundered from Mr. Roux, the supercargo......... | 470 00 |
| from the master ....... | 100 00 |
| from the mate......... | 80 00 |
| from four of the mariners.................. | 124 00 |
| Losses sustained in consequence of the expenses occasioned by the seizure and condemnation in Antigua, growing out of the schooner having been deprived of her papers by the crew of the Scourge, as proved by the deposition of Samuel Dawson and T. Lavand of Port-au-Prince............ .... | 3,500 00 |
| Interest on this sum from 1st January, 1815, to 1st July, 1817, at 6 per cent. per annum...................... | 1,206 07 |
| Allowance for Mr. Roux's expenses to and from Port-au-Prince, Antigua, Boston, &c. detention in New York, loss of time, and other incidental expenses, procuring evidence, and attending the trial....................... | 1,500 00 |

$10,746 67

This report was filed and confirmed on the 30th June, 1817, when the court further decreed, that there be paid to the libellants for personal injuries the following sums:

| | |
|---|---|
| To the supercargo.............. | $  500 |
| To the captain.................. | 100 |
| To the mate.................... | 100 |
| To the mariner, Elia Lenar..... | 50 |
| To the supercargo for commission.................... | 1,000 |
| For counsel fees, proctor's fees, and the costs of court........ | 750 |

2,500 00

$13,246 67

making a sum total to be paid by the appellants of $13,246.67.

From this decree the owners of the Scourge have appealed to this court, and contend,

1. That the district court had no jurisdiction of the cause.

This court will not stop to inquire whether it be too late to urge this objection to the decree, because, which is one answer given to it by the respondent, no plea to the jurisdiction was interposed below; for it entertains no doubt that the libel was properly filed in that court, and that error would have been committed if it had been dismissed on that ground. Some doubts were expressed whether, if such cases be cognizable in the district court, they are so in virtue of the powers which it possesses as a prize, or of those which exercise it as an instance court; and it was supposed, or at least intimated, by one of the appellant's counsel, that if cases of this kind were to be regarded as appendages of its prize jurisdiction, the present suit could not be sustained, in as much as the district court possessed no such jurisdiction, without some special act of congress conferring it. In support of this position, the practice of Great Britain was referred to. It is true that a court of admiralty in England, merely as such, has no jurisdiction over prizes; but that to constitute such an authority in it, or to call it forth at the breaking out of hostilities, a commission under the great seal issues to the lord high admiral to enjoin it on the court of admiralty to proceed on all cases of captures, &c. and to hear and determine according to the course of the admiralty and the law of nations. Such is undoubtedly the practice of Great Britain, introduced probably from a silence on this subject in the commission by which a judge of the admiralty is appointed, which enumerates particularly every object of his jurisdiction, but says nothing of prizes. It is not known that this is the practice of any other nation, but it is believed that their courts of admiralty, are regarded as the national and proper tribunals for taking cognizance of captures in time of war, without any special delegation from the sovereign for that purpose, on every commencement of hostilities. If so, and the district court by its act of organization has exclusive original cognizance of "all civil causes of admiralty and maritime jurisdiction," why should it be restricted in its cognizance to such cases as belong to the English courts of admiralty as instance courts, more than those of any other nation? Civil causes, it is said, do not embrace cases of prize, which arise out of and are determined by the jus belli, and not by the civil or municipal law. But it cannot be necessary to pursue this inquiry farther; for as early as the year 1794 [Penhallow v. Doane,] 3 Dall, [3 U. S.] 61, the supreme court of the United States unanimously decided, that every district court of the United States possessed all the powers of a court of admiralty, whether considered as an instance or as a prize court; so that, if the present case belongs to the admiralty at all, which is not denied, it is unimportant in the present inquiry to determine under what particular branch of its jurisdiction it be cognizable, as it must have a right to inquire into and to ascertain the quantum of damages and costs in all cases of marine trespass or tort.

But admitting the jurisdiction of the district court, it is denied by the appellants, that they are liable at all for the injuries enumerated in the libel. After so many and such

direct authorities on this point, it is matter of some surprise that a question of this kind should be made. It has long been regarded as a general principle of maritime law, and not resulting from any special contract, that owners of a privateer are liable for torts committed by captains whom they may employ; and whatever doubt may have once existed as to the extent of this responsibility, it is now well settled, that it is not limited by the value of the privateer, which would often prove a very inadequate compensation, but that they are personally accountable for the whole of the injury committed. This is not only the uniform language of elementary writers, who have treated of the subject, but is one of the points decided by the supreme court in the case already referred to. It is there declared, "that the owners of a privateer are responsible for the conduct of their agents, the officers and crew, to all the world, and that the measure of such responsibility is the full value of the property injured or destroyed." The only exception to this rule, or rather the only case which is supposed not to fall within it, is where the master is guilty of a tort in matters totally foreign to his authority; and this is supposed to be the case before the court. The authority of the boarding crew extended, it is said, to the making of a search, and to capture, if circumstances should justify it, but not to rob and ill treat the crew of a friendly vessel.

Admitting this to have been their authority, if they were acting under it, as was the case when they committed the outrage, the owners are liable, although the outrage itself was not intended to have been sanctioned by it. "If the captain of a privateer," says Browne, "emissus ad praedandum perperam proedetur, if commissioned to cruise against an enemy, he plunders a friend, the owner is responsible;" and assigns as a reason, that his agent was then acting within his province when the wrong was perpetrated. So the owners were held liable by the supreme court of the United States in the case of Del Col v. Arnold, 3 Dall. [3 U. S.] 333, for any spoliation or damage done to the property, which was not considered as authorized or excused by a right to seize and bring in a vessel for further examination.

The court being of opinion that the owners in this case are responsible to the libellants, will proceed to inquire to what extent the latter can ask a compensation at their hands; and whether the district court has not erred in the principles which it adopted in fixing on this remuneration. The court cannot refrain from remarking, before it proceeds, that it is impossible not to be struck with the very large amount which has been assessed for damages, when compared with the actual injury sustained. The whole of the property plundered was not worth, in the opinion of the libellants themselves, who cannot be suspected of an under-valuation, more than six hundred dollars, or thereabouts, and

the appellants have been decreed to pay for this outrage, connected with some personal injury, very improper indeed, but not very serious. and for which seven hundred and fifty dollars was deemed an adequate recompense, the large sum of thirteen thousand two hundred and forty-six dollars and forty-six cents; that is, more than twenty times the extent of the articles plundered, and more than four times the value of the schooner and the whole of the cargo, although the vessel remained with the owner, and no part of the cargo was touched. It may well, therefore, be supposed, that some mistake has been made; as such damages for such an injury are, probably, without example in any court, of whose decisions we have any information.

The appellants say, that the respondents are entitled to nothing more than an indemnity for the property taken, and to a reasonable remuneration for personal injuries. Believing this to be the proper and only safe rule of damage, they insist that they are entitled to be relieved here against the sums allowed for redeeming the vessel at Antigua, after the condemnation, for the loss sustained on the sales of the cargo at that place; and for the loss sustained in consequence of the schooner's not completing her voyage to Bermuda, and returning from thence to Port-au-Prince. These are not exactly the terms in which this loss is expressed; but it is very clear that the report, by referring to the testimony of Dawson and Lavand, intended the allowance of three thousand five hundred dollars, as a compensation for the loss of the voyage. The interest on these items, and the commission of the supercargo, are also objected to by the appellants. These sums form an aggregate of nine thousand thirty-three dollars and sixty-seven cents. All these allowances were made on a supposition, that the losses for which they were intended as a compensation, were produced by the destruction of the schooner's papers.

It is not possible to express in language sufficiently strong, the indignant feelings which are excited by this wanton act on the part of the boarding crew; but we must not indulge these feelings so far as to prevent a dispassionate consideration of the conduct of the supercargo, and whether it has justly involved the appellants in the very extensive responsibilities which, it is alleged, have grown out of it. Without determining what consequence or liability might have attached to the owners of the privateer, if a condemnation after a full defence had been pronounced for the want of papers, the court will inquire, whether they can be liable for any damage occasioned by the compromise that was made. To render this act of the supercargo binding on the appellants, so far as to create in them a responsibility for any of its consequences, it ought to have been made not only in good faith, but it should

be one which might be fairly justified by the circumstances of the case, and above all, there should be some privity between those making and those who are to be affected by it. The bona fides of this transaction the court is not disposed to call in question, although it would have been more satisfactorily made out, if the supercargo, instead of relying on the advice of his consignee, who was not a professional gentleman, had submitted the case to a proctor in the island of Antigua, and had acted under his directions.

But however fair the conduct of the supercargo may have been in this transaction, this court is of opinion, that the circumstances in which the schooner and cargo were found at Antigua, did not call for any such sacrifice, as was agreed to by the supercargo. If it be true, that the only cause alleged for proceeding against them as a prize of war, was a want of papers, it would be a libel on the court of vice-admiralty of that island, or any other court, to entertain a moment's doubt of their acquittal and restoration, as soon as it appeared, as it would by the answers to the standing interrogatories, that such destitution was occasioned by a robbery or plunder on the high seas. Nor is it to be believed, if that fact was satisfactorily made out, that the captors would think of an appeal. The apprehensions, therefore, of great delay and a heavy expense, were altogether visionary. But if the compromise were proper, and made in good faith, there is such a total absence of all privity between the parties making it, and those who are now to be charged with it, that it must be considered as altogether at the peril of the former. A compromise with captors in time of war, respecting property under insurance, is binding upon underwriters, because by capture a technical total loss takes place, upon which the master becomes an agent for all the parties in interest, and it is therefore reasonable that his acts should bind those whom he represents. But in the case before the court, there is no contract or agency expressed or implied. A trespass can never create such a relation between those who commit the tort and those who are injured by it, as to constitute the latter the attornies or agents of the former.

None of the consequences therefore flowing from the compromise are chargeable on the appellants. This however, is not the only ground for rejecting many of the allowances which were made by the district court. If the compromise were binding on the appellants, they have been rendered answerable for damages, either not necessarily consequent on it, or too uncertain. if they are to form a proper charge against the owners of the Scourge. To this objection the charge of three thousand five hundred dollars for loss of voyage, is peculiarly liable, which is also a departure

from the rule prescribed for the assessment of damages, in cases of this kind, by the supreme court of the United States. By that rule, the measure of responsibility, "is the full value of the property injured or destroyed."

Damages for the loss of voyage, are by much too contingent and uncertain, to form the basis of any satisfactory calculations; for if it be adopted as a rule, it must apply to long as well as to short voyages. Every one will at once perceive the injustice of such an allowance in an India voyage, where a capture and plunder of all her specie might take place, the very day after the vessel's leaving port; and in less than a fortnight she might be on a second voyage with a new supply of dollars. Why, in such a case, should the profits be paid by the captors? And here, who can say, although the voyage be shorter, that the Amiable Nancy would ever have arrived at Bermuda, or what might have been the state of the market there, or whether the muskets would have been delivered according to contract? Or if so, whether the vessel would have reached Port-au-Prince in safety, and found the government of Hayti disposed to pay for them, at what is now alleged to have been the stipulated price? Or who can say, if it be conceded that the original voyage was frustrated by the irregular conduct of the crew of the privateer, (which may well be doubted, as the schooner was bound to Antigua when she was boarded.) that another voyage equally, or more profitable, might not have been projected at Antigua?

It is a fact in this cause, that a very enormous profit, approaching to three hundred per cent., was made on the cargo shipped at St. Bartholomews, and sold at Port-au-Prince, which, it is true, was not very large; but if the appellants be liable for any loss occasioned by not going to Bermuda, some deduction should be made for the gains actually made on the voyage from St. Bartholomews to Port-au-Prince. The nature of this action, however, is relied on as justifying a mode of assessing damages different from the one which is applied to ordinary cases of trespass. It is taken for granted, that vindictive damages are to be recovered, and that in such cases a court will not be very particular as to the limits within which it will circumscribe a defendant's liability. But why assess vindictive damages? Have the appellants committed the outrage, or ordered it, or in any way sanctioned it? Or have they divided the plunder, or derived any benefit whatever from it? They were employing their vessel in a way permitted and encouraged by the government of their country, and under the securities prescribed by law. It is true, they have had the misfortune, which is but too common in this business, of employing men who have disgraced the flag under which they acted.

Unless this misfortune be attributed to them as a crime, they are innocent of any actual or intentional injury, and perhaps more entitled to the protection of the court than those who are generally defendants in actions of trespass.

However desirable it may be, in the opinion of many, to put a stop to this mode of warfare, no court has a right to throw obstacles in its way, or to discourage it, by imposing excessive and extravagant penalties for every irregularity, however trifling, so long as government think proper to furnish public and private vessels with commissions of this kind. If the rule of vindictive damage, which has been pressed upon the court, were adopted, it might amount to a total prohibition of privateering; which no court, mindful of its duty, will think it has any right to effect in this way. Nor will such mode of assessing damages add much, while the practice is continued, to the security which neutrals already have, against occasional trespasses on their property. If the fear of a forfeiture of wages and corporal punishment, to both of which some of this crew have been sentenced by a naval court martial for their improper conduct, will not restrain mariners, who engage in this service, within proper limits, it is not probable that they will be influenced by any apprehensions of laying on their employers an onerous responsibility. But if such a rule is to be resorted to, as a means of exciting those who engage in this species of warfare to greater circumspection in the choice of seamen, it is believed that every expectation of that kind will prove fallacious. It will not be easy, whatever care or diligence be used, to make any discrimination on which much dependence can be placed. Seamen for this purpose would continue to be selected more for their bodily strength, their personal courage and seamanship, than from any regard to their moral character; about which it would be much more difficult to acquire information, than concerning the other qualifications which have been mentioned.

There are other objections to such an arbitrary measure of damages. It places too much in the discretion of a judge, who, under the influence of the angry feelings which such irregularities are well calculated to call forth, would often award an immoderate compensation without reflecting, that the person who is to make it, may be as innocent as those to whom it is to be paid, and may hold in as great detestation as the court itself the violation or wrong that has been perpetrated. Such heavy assessments, and which are scarcely reducible to any rule, will also prevent compromises between the parties. No offer of compensation by the owner of a privateer, however fair, and although fully commensurate with the loss that has been sustained, will satisfy the extravagant pretensions of the injured party, which such a rule will prompt him to set up.

Neither is the loss on the corn, from the damage occasioned by the conduct of the Spider's crew, to be thrown on the appellants. This would render them liable, not only for the illegal acts of their own mariners, but of those in whose choice they could have no agency.

The supercargo's commission must also be deducted; for besides the objection to it, that its loss was occasioned, if at all, by his own compromise, it is liable to a further difficulty. It does not appear what remuneration he was to receive, but by scarcely any possibility could his commission on the sales of the outward cargo, to which it must be restricted, have amounted to any thing like the sum which has been allowed. There is nothing indeed in the evidence to render it very clear, that his commission has not been earned and paid.

The interest on these items will, of course, be deducted, and indeed if these sums were allowed, it would hardly be proper, after so liberal an assessment of damages, to have calculated any interest on them.

Little or no objection has been made to the compensation allowed for the personal wrongs inflicted on some of the respondents, which therefore will not be disturbed; but I cannot suppress my surprise, that for injuries of this nature, which are often produced by some intemperate language of the party claiming a recompense, the owners should ever have been considered as answerable.

Considering that seven hundred and fifty dollars has been allowed for counsel fees, and the proctor's costs, and the costs of court, the further sum of fifteen hundred dollars, given to Mr. Roux for his expenses in producing evidences, attending the trial, &c., is too much, and must be reduced one half, especially as the greater part of the testimony has been collected for the purpose of rendering the appellants liable for charges, which, in the opinion of this court, cannot be recovered of them.

This court reverses the sentence of the district court, and allows as follows:

| | | |
|---|---:|---:|
| To the owners of the schooner for expenses during the detention at Antigua, according to the estimate of the consignee | $300 00 | |
| For the expenses of mate and supercargo while there, and according to the estimate of the same witness | 70 00 | |
| For articles plundered from schooner | 25 00 | |
| Interest on these sums at ten per cent. from 1st January, 1815, to 1st September, 1817, two years and eight months | 103 94 | |
| | | $ 498 94 |
| To the master of the schooner for articles taken from him | 100 00 | |
| The same interest | 26 66 | |
| For personal injuries | 100 00 | |
| | | 226 66 |
| | | 725 60 |

| | | |
|---|---:|---:|
| Amount brought forward .... | | $725 60 |
| To the supercargo, | | |
| For articles taken from him.... | 470 00 | |
| The same interest.............. | 114 32 | |
| For personal wrongs............ | 500 00 | |
| For his expenses in collecting testimony at Antigua, Port-au-Prince, &c., and attending trial......................... | 750 00 | |
| | | 1,864 32 |
| To the mate, | | |
| For property lost by him........ | 80 00 | |
| The like interest................ | 21 32 | |
| For the injury to his person.... | 100 00 | |
| | | 201 32 |
| To Lenar, the sailor, | | |
| For property taken from him.... | 54 00 | |
| The like interest................ | 14 40 | |
| For his personal injury......... | 50 00 | |
| | | 118 40 |
| | | $2,909 64 |

It is therefore ordered, adjudged, and decreed, that the sentence of the district court be reversed, and that there be paid by the appellants to the respondents and libellants, the said sum of two thousand nine hundred and nine dollars and sixty-four cents, in the manner following, that is to say: To the libellant, Peter Joseph Merault, owner of the schooner and cargo, the sum of four hundred and ninety-eight dollars ninety-four cents: To the libellant, Galien Aneil, master of the schooner, the sum of two hundred and twenty-six dollars sixty-six cents: To the libellant, Frederick Roux, the supercargo, the sum of eighteen hundred and sixty-four dollars thirty-two cents: To the libellant, Anthony Moasset, the mate, the sum of two hundred and one dollars thirty-two cents; and to the libellant, Elia Lenar, one of the mariners, the sum of one hundred and eighteen dollars forty cents. And it is further ordered, adjudged, and decreed, that the appellants pay to the libellants the further sum of seven hundred and fifty dollars for counsel fees, and also the proctor's costs, and the costs of the district court, to be taxed; and it is further ordered, that each party pay his own costs in this court.

[NOTE. On appeal to the supreme court, the point embraced in the first paragraph of the syllabus was affirmed: and it was further held that, in the event of an illegal seizure, the wrongdoers are responsible in case of wanton outrage, though the owners of the privateer are not bound to the extent of vindictive damages. The item for deterioration of cargo was rejected, because it was not occasioned by the improper conduct of the captors. The measure of damages is the cost or value of the property lost, and, in case of injury, the diminution in value by reason thereof, with interest; but no allowance should be made for possible profits of an unfinished voyage. The items for ransom were rejected, but allowance for court and other expenses, amounting to $774.21, was added to the decree of the circuit court. The Amiable Nancy, 3 Wheat. (16 U. S.) 546.]

---

AMINHISOR, (UNITED STATES v.)